IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 10, 2012 Session

## LORI ANNE YATTONI-PRESTWOOD  v. JOHN STEWART PRESTWOOD

**Appeal from the Circuit Court for Hamilton County**
**No. 09D1303      Jacqueline S. Bolton, Judge**

**No. E2011-01967-COA-R3-CV-FILED-AUGUST 29, 2012**

This is a divorce case that focuses on the parties' debt and the issue of attorney's fees.  The trial court dissolved the  marriage of Lori Anne Yattoni-Prestwood ("Wife") and John Stewart Prestwood ("Husband").  During their brief time together, the parties accumulated only debt, no assets.  Husband's liability for the parties' debts was discharged in bankruptcy. In considering the issue of property division and allocation of debt, the trial court found that expenditures made by Wife to and for Husband's benefit, both before and during the marriage, were "gifts" to him; accordingly, the court declined to treat the after-marriage payments as marital obligations.  Instead, the court decreed that each party would be responsible for that party's "own respective liabilities."  Wife appeals and contends that the trial court erred in failing to properly classify and equitably divide the marital debt and in denying, after first approving, her request for an award of attorney's fees.  She also seeks an award of her fees for legal work on appeal.  We modify the judgment as it pertains to the parties' debt in a way that results in an alimony in solido award to Wife.  As additional alimony in solido, we award Wife her reasonable attorney's fees for work at the trial court level.  We further grant Wife's request for an award of her attorney's fees incurred for work on appeal as further alimony in solido.  In all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Sandra J. Bott, Chattanooga, Tennessee, for the appellant, Lori Anne Yattoni-Prestwood.

John Stewart Prestwood, Chattanooga, Tennessee, appellee, pro se.[1]

---

[1]Wife filed a motion to strike Husband's brief.  The motion is denied.

# OPINION

## I.

Husband and Wife met in April 2008 on an internet dating site. They met in person when Husband returned to Chattanooga. Both had been married before – Husband twice, and Wife once. The parties had no children together, but Wife's teenage daughter lived with the parties. After a "whirlwind" courtship, they were married on July 26, 2008. They separated ten months later. Wife sued for divorce in June 2009. While the divorce was pending, Peoples Bank ("the Bank") sued on a promissary note that the parties had executed before the marriage in connection with the refinancing of property ("the Intermont property") owned by Husband. The Bank's case was consolidated with the parties' divorce. In May 2010, also during the pendency of the divorce, Husband filed a petition in bankruptcy seeking a discharge pursuant to Chapter 7 of the Bankruptcy Code. His debts were discharged in that proceeding. After the Intermont property was sold at foreclosure, the Bank continued to pursue its action, but only against Wife. It sought a deficiency judgment in the amount of $35,096.18 plus interest and fees.

Trial was held on January 18, 2011. At the start of the proceedings, Wife announced that she had agreed with the Bank to the entry of a judgment in the amount of $15,000 in settlement of the Bank's claim. The trial proceeded in the divorce matter.

In 2007, before the parties met, Husband purchased the Intermont property for $106,000; later he secured the rezoning of the property to a commercial designation. His plan was to sell the property for office space. In 2008, Husband decided to refinance the mortgage debt on the Intermont property. Ten days before the parties' marriage, Husband refinanced the debt; on the new debt, Husband was the primary borrower and Wife was a co-signer. Wife was never an owner of the Intermont property.

The Bank distributed the loan proceeds in two checks; the first, for $105,682.76, was used to pay off Husband's original loan. Husband deposited the remaining proceeds, $62,317.24, into his personal checking account. Wife testified she paid for the appraisal and the closing costs, but received none of the proceeds. Husband used $16,000 of the proceeds to pay a debt due a former girlfriend. Husband testified that he and his former girlfriend were partners in a venture to buy property, sell it, and thereafter split the hoped-for profit. He said that venture was similar to the one he had with Wife on the Intermont property. Wife said she agreed to co-sign the note based upon Husband's assurance that he could repay the loan; she testified that Husband told her he needed a co-signer because he had so many other properties at the time and because loan requirements had changed. Husband testified that the

parties were partners and that this was a "business proposition" in which both stood to make a profit.

Husband, 44, was a real estate appraiser, who owned his business for over 15 years. He also made money by purchasing and renovating properties, then refinancing the loans so as to spin off his equity as money in his pocket. Husband estimated that, during the marriage, he earned about $30,000 a year. Wife, 46, had a real estate license but worked very little since the end of her first marriage. She estimated that she earned between $7,000 and $15,000 a year. Asked whether she worked during the marriage, Wife replied, "I was a real estate agent, I guess."

Both parties brought assets to the marriage. In 2004, as a part of a settlement in her first divorce, Wife was awarded a lake lot. She sold the property and used most of the proceeds to buy two properties outright – her personal residence ("West Pointe Drive"), and a rental property ("Signal View"). Wife also owned a Mercedes sports car and jewelry including a custom Rolex watch, all of which she received from her first husband. In addition, she estimated that she had some $20,000 or more in cash remaining from her divorce settlement. Wife had no debt at the time of the marriage except for an obligation on a loan for a Toyota automobile and a $5,000 balance on her Bank of America Mastercard.

Husband owned a home ("Valleybrook Circle"), three or four rental properties, and the Intermont property, all of which were mortgaged. Valleybrook Circle had a first and second mortgage and the two mortgage payments totaled nearly $5,000 a month. In addition to his 34-foot Wellcraft boat, Husband had a new Ford truck, a Corvette, a collection of sports cars, and a Harley Davidson motorcycle. Husband initially testified that only the Ford truck was encumbered with a lien; in later testimony, however, he indicated that he borrowed against some of the sports cars the month before the parties met. In addition, the remaining Intermont loan proceeds – less than $18,000 – remained in his checking account at the time of the marriage. Husband testified that some of the funds went toward shared expenses – he gave, as an example, the mortgage payment on his home during the first month of the marriage. By the end of the next month, the account had a balance of only $2,300.

When the parties returned from their honeymoon, they decided to move into Husband's Valleybrook Circle home, leaving Wife's West Pointe Drive home vacant. Husband said he suggested selling his home and moving into Wife's paid-for property, but "she wanted to live in my house with the swimming pool and the hot tub. . . ." Wife testified that, a few weeks later, Husband suggested that she refinance her Signal View property. She did so and obtained a $99,000 line of credit. Wife presented a list of expenditures to and for Husband during the marriage out of funds in her checking account, including the monies from the equity line. Wife testified that she had wrote $90,212.95 in checks directly to

Husband or in payment of expenses for him.  Among the listed items were payments for Husband's truck, a boat repair, repairs to a rental property, a $19,000 plus balloon payment due on Husband's Corvette, checks directly to him totaling $30,000, an American Express credit card payment of $16,000 for Wife's engagement ring, tree cutting at Husband's property, and a business advertisement expense.  She also had pages of other assorted payments to or for him.  In addition, Wife sold, at a loss, a diamond ring and a diamond bracelet she received from her first husband, and used the money to pay credit card bills.

Acknowledging the checks from Wife to him during the marriage, Husband said, "honestly, we lived beyond our means when we shouldn't have been."  He said the couple spent money on eating out, friends and liquor.  Husband said he had used the various expenditures for their living expenses.  He said he spent more than $12,000 to renovate a closet in his home for all of Wife's shoes and clothes, and more money to renovate a bedroom and bath for her daughter.  Husband agreed he had rental properties during the marriage, but said the income never covered the expenses.  Husband said he generally paid the household bills, but Wife paid "every now and again."

At trial, Husband was questioned extensively about the information he provided on the Intermont loan application.  Husband acknowledged the document was signed on February 25, 2008 – before the marriage.  On the application, Husband stated income of $13,500 per month from his appraisal business and another $5,000 a month in "rental/investment" property income.  Regarding his personal wealth, Husband claimed total assets of $2,306,000, and a net worth of nearly $1.6 million.   When asked whether it was true that, as stated in the application, he also had $18,000 "cash on hand," he replied, "[m]ay or may not."  Husband testified that it wouldn't surprise him to hear that his bank account had a negative $285.00 balance two months before he married Wife.  Husband testified he had fully disclosed his financial condition to Wife before the marriage  and said he told her he was "borderline bankrupt."  Husband said he told Wife he was not in  a position to get married until he had handled his finances, but Wife insisted: "She said she  had over half a million dollars in assets and that she loved me and that she didn't care  whether we . . . won or lost financially, that she wanted to partner up with me and make a go  of things financially."  Wife denied making any such statements.  She agreed that Husband  told her he was having some "financial difficulties," but said she later learned that his idea of financial difficulties and hers was "very different."

In response to further questioning about the Intermont property, Husband stated,

> [t]his was for People[s] Bank.  This has been discharged.  This
> has nothing to do with you.

Husband agreed, however, that the debt was not discharged as to Wife. He suggested she could also file for bankruptcy protection if she sold her home. By his calculations, she could pay the Intermont judgment and the other debts and still be "180 [thousand dollars] in the good." Asked what benefit Wife derived from the refinancing of his office building, Husband said, "I don't know," then added that Wife

> lived a good life. She lived in a house with a swimming pool and a hot tub. She had her friends over every day drinking all day long.

At the time of trial, Wife's debts, including the Peoples Bank judgment, totaled about $155,000. Wife said that Husband was "very well aware" that the monies she had used toward his expenses were intended to take care of her daughter and that she "very much expected" them to be paid by him. Wife said she had not maintained her real estate license because she couldn't afford the $1,200 in yearly fees. She said she had "resumes out everywhere" trying to find any kind of job.

Wife's income and expense statement reflects that Wife earns $2,450 a month in rental income from the Signal View and West Pointe Drive properties. Her expenses are reflected in her statement as $3,328 a month, including $1,000 in rent and utilities, $400 in "interest-only" payments on the Signal View loan, $500 in credit card payments, and $300 toward her attorney's fees. Thus, according to the statement, Wife's expenses exceed her income by $878 each month. Wife explained that she had transferred her West Pointe Drive home, valued at $190,000, to her parents by way of a quitclaim deed, in order to keep it for her daughter's benefit and to prevent Husband from getting it. It was being rented out, but her parents allowed her to keep the rental income. Wife's Signal View property was also leased – for $800 a month.

Wife said her Toyota was repossessed and she sold her Mercedes and used the proceeds to pay bills. Wife testified at the divorce hearing that, on the very day she testified in an *earlier* hearing that she kept a safe for valuables, someone kicked in the back door to her home and stole the small safe and an expensive Rolex watch; she strongly suspected Husband was responsible for the theft, but that an investigation did not result in any charges. In addition to the Bank, Wife had been sued by American Express and other credit card companies, but she did not want to file for bankruptcy, as Husband had suggested. In hindsight, Wife believed that Husband "never loved [her]," and "was out for himself and to pay his bills." She said she was in debt, "scared," and needed Husband to "honor his debt."

At the time of the hearing, Husband was living on a houseboat he rented for $500 a month. He drove a Mercedes 500 convertible that his mother and aunt had bought him. He

testified that he was still doing appraisals and that he earned $10,000 to $12,000 a year, which, according to him, barely covered his basic expenses. He said he was looking for other work, but that he no longer tried to earn money renovating properties or selling cars. Husband's 2009 income tax return reflected that he had an adjusted gross income that year of nearly $12,000; in addition to his appraisal income, he had a loss of some $5,000 in car sales, and rental income of $1,145. Husband had discharged $473,603 of debts in the bankruptcy. Husband said his mother helped him cover expenses each month. He was evicted from his townhouse three months before trial for non-payment of rent, at which time he moved to the houseboat.

Husband said that, on the advice of counsel, he listed Wife as a creditor on his bankruptcy schedules. As to his opinion of whether he owed Wife anything, Husband stated:

> [W]e went in together as a married couple. The economy was bad. We're both real estate people. We both know we were starving. She – she chose to get out of the marriage; I didn't.

Wife's May 2009 American Express statement contained a handwritten note from Husband – "I will try to pay you $4,000 when I get it." According to Husband, this was the only money he ever agreed to repay to Wife.

At the conclusion of the proof, the trial court reserved judgment pending the resolution of the bankruptcy proceeding. In February 2011, the bankruptcy court made an oral ruling dismissing Wife's adversary proceeding against Husband. On May 5, 2011, the trial court entered its findings of facts and conclusions of law. Therein, the trial court granted the parties a divorce, found they accumulated no marital assets, and ordered that the parties would retain their separate property and be responsible for their "own liabilities."

In response to post-trial motions, the court reopened the proof and heard argument, mainly focused on the question of whether Husband's discharge in bankruptcy "trumped" the trial court's ability to assign him debt in the divorce. In a detailed affidavit, bankruptcy attorney Jerrold D. Farinash presented an analysis of current bankruptcy law and essentially advised the court that it had the authority to impose domestic support obligations or a lump sum judgment against Husband and that such debts would be nondischargeable and could be imposed without violating the bankruptcy court's discharge order. After the hearing, the court determined that, notwithstanding its authority regarding debt, its earlier decision would remain unchanged. The court adopted its May 5 findings of fact and conclusions of law as its final judgment. In a supplemental order, and contrary to an earlier ruling, the court summarily denied Wife's request for an award of her attorney's fees. Wife timely filed a notice of appeal.

II.

Wife raises three issues for our consideration:

1. The trial court erred in assigning one hundred percent of the marital debt to Wife.

2. The trial court erred in failing to award Wife her attorney's fees after finding that Husband should pay Wife's reasonable attorney's fees.

3. Wife is entitled to her reasonable attorney's fees for this appeal.

III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Wright v. City of Knoxville**, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's conclusions of law. **Kendrick v. Shoemake**, 90 S.W.3d 566, 569 (Tenn. 2002); **Campbell v. Florida Steel Corp**., 919 S.W.2d 26, 35 (Tenn. 1996).

A trial court has broad discretion in fashioning a division of marital property. **Fisher v. Fisher**, 648 S.W.2d 244, 246 (Tenn. 1983); **Barnhill v. Barnhill**, 826 S.W.2d 443, 449-50 (Tenn. Ct. App. 1991). A finding of an abuse of discretion is usually predicated upon the court's application of an incorrect legal standard, unsound reasoning, or reliance upon erroneous facts. **Eldridge v. Eldridge**, 42 S.W.3d 82, 85 (Tenn. 2001).

IV.

A.

Wife asserts that the trial court erred in characterizing payments made by her to or for Husband, both before and after the marriage, as "gifts" from her to Husband. She also argues that the court erred in ruling that debts incurred by Wife in connection with these payments were her sole responsibility. The court labeled these debts as the separate debts of Wife. Wife contends that this decree by the court is not equitable.

We quote the following pertinent portions of the trial court's ruling:

> Throughout the short marriage, both individuals continued to spend and financially commit themselves in excess of any actual earnings or expected earnings.
>
>       \*     \*     \*
>
> Several imprudent financial decisions were made throughout the couple's short-lived relationship. Before the parties were married, in February 2008, Wife signed as a co-borrower on a note for the Intermont Property. [. . .] The Loan Application clearly states that the funds are to reimburse for renovation money, and the primary borrower is Husband. Wife provided substantial amounts of money to Husband before marriage and throughout marriage in the forms of credit cards and cash transfers to his bank account. All of these transfers were done willingly and without any evidence of fraud or duress. These transfers are viewed as gifts and it is impossible to now compensate Wife for these transfers.
>
> Tennessee case law is clear. It is the Court's hope and desire to place parties of a short marriage in similar positions as if the marriage had never taken place. This goal is not to trump all other concerns though.
>
>       \*     \*     \*
>
> Here, the parties have had a significant change in value of their total assets during the marriage. [. . .] [T]he value in the present case was destroyed. [P]lacing the parties in a position as if the marriage never took place would be impossible. The parties to this marriage entered into several financially imprudent transactions, transferred significant amounts of money amongst themselves, and have almost no assets to show for these actions. Wife concedes that Husband's only asset and separate property is a Mercedes Benz which his mother purchased for him. In

Exhibit 3,[2]Wife asks for this Court to provide approximately $103,343.00 in liability to Husband.[3] This Court finds that these transactions were conducted freely and willingly during and before marriage. Accordingly the Court cannot enter the judgment the Wife seeks.

Using Exhibit 3 for guidance, the parties shall both retain their respective separate property. The Husband shall keep the household goods and furnishings, his clothing, the 1999 Mercedes SL 500 and the 1989 Ford [v]an. The Wife shall retain the [Signal View] residence . . . , the household goods and furnishings listed [on exhibit] 3, jewelry, and clothing. *Husband shall pay Wife's reasonable attorney fees*.

The parties shall be responsible for their own respective liabilities. The Court is unable to find any duress, fraud, or willful misconduct on the evidence presented. While unfortunate, the excessive expenditures and financially reckless behavior of these parties makes it impossible to place the parties in positions as [if] the marriage never happened.

(Internal citations omitted; footnotes and emphasis added.)

B.

Marital debts are "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." ***Alford v. Alford***, 120 S.W.3d 810, 813 (Tenn. 2003); Tenn. Code Ann. § 36-4-121(b)(1)(A). In Tennessee, the equitable distribution of marital debt is accomplished with reference to the following guidelines: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." ***Id.*** at 814. *(*citing ***Mondelli v. Howard***, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)). "A careful application of these factors will insure the fairest possible allocation of debt. It will also protect the spouse who did not incur the debt from bearing responsibility for debts that are the result of personal excesses of the other spouse." ***Id***.

---

[2]Exhibit 3 is Wife's Assets and Liabilities Statement. Husband submitted no statement of income, expenses, liabilities, or assets at trial.

[3]It is not clear to us, from a review of Exhibit 3, how the trial court derived this figure; the exhibit contains no specific amount requested by Wife or deemed by her as Husband's share of the liabilities.

As the trial court recognized, the well-established legal precedent [is] that "in cases involving a marriage of relatively short duration, it is appropriate to divide the property in a way that, as nearly as possible, places the parties in the same position they would have been in had the marriage never taken place." **Batson v. Batson**, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). We are further mindful that the over-arching goal in division of marital property is "to divide the parties' marital estate in a just and equitable manner." **Morton v. Morton**, 182 S.W.3d 821, 833 (Tenn. Ct. App. 2005)(quoting **King v. King**, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)).

C.

With these principles in mind, we now turn to the debts in the present case. As did the trial court, we reference Exhibit 3, Wife's Statement of Assets and Liabilities, to identify and classify the debts at issue. There are essentially three logical groupings – (1) the Intermont loan, represented by the $15,000 settlement between Wife and the Bank; (2) the $99,000 equity line on the Signal View property; and (3) the outstanding credit card balances on four of Wife's credit cards.

First, we address the Intermont loan. In short, this is not a marital debt. The proof was that the loan was applied for and the proceeds distributed to Husband, shortly *before* the parties were married. Because the loan was not a debt incurred by either party *during the marriage*, it is not included within the definition of "marital debt." It follows that the Intermont loan is not subject to distribution as a part of the division of the marital estate; rather, the loan is a *pre-marriage* obligation of Husband and Wife. While Husband's obligation to pay this debt was discharged in bankruptcy, we believe that, as between these two parties, Husband should ultimately be responsible for the relatively modest remaining portion of the debt as evidenced by Wife's settlement with the Bank. Applying **Alford** principles, we note that $105,682.76 of the proceeds was used to pay off an obligation that was solely the debt of Husband. We also note that the balance of the proceeds went into Husband's personal bank account. Under the most relevant (in this case) of the **Alford** principles, Husband was the "party [who] benefitted from incurring the debt" or, at a minimum, the party who benefitted the most from the loan. While this is not a marital debt, using **Alford** as an example of a good equity analysis, we are persuaded that Husband should be burdened with the balance of the loan of $15,000. Therefore, in the form of alimony in solido as support to Wife, she is awarded a judgment against Husband for $15,000.

Next, we consider the $99,000 line of credit Wife secured by refinancing her Signal View property. With respect to this debt, it is without question a marital debt, having been incurred by Wife shortly after the parties were married. From the initial funds accessed by Wife on the line of credit, she paid a $10,000 pre-marital debt incurred in connection with

-10-

renovations and repairs to Signal View, Wife's separate property. The evidence shows that the remaining funds obtained from the equity line, approximately $89,000, were deposited into Wife's checking account and spent during the marriage. As previously noted, this equity line is properly classified as marital debt. We will discuss the disposition of this $89,000 in marital debt shortly.

We next consider Wife's credit cards. They are identified in Exhibit 3, together with the balances owed. These are debts incurred during the marriage. They are as follows:

| | |
|---|---|
| Citibank Visa | $ 7,000 |
| Bank of America Mastercard | 2,000[4] |
| American Express | 7,500 |
| Capital One Mastercard | 3,200 |
| | |
| Total credit card debt | $19,700 |

Lastly, we note that among the liabilities listed in Exhibit 3 is a balance of $4,000 due on Wife's Toyota, and $3,143.18 in "medical bills." There was no testimony at trial about the medical bills. We exclude consideration of these two debts as they are properly classified as Wife's separate debts. By our estimation, then, there is marital debt in the amount of $108,700 – $89,000 of the equity line of credit plus $19,700 in credit card debt – subject to equitable distribution between the parties.

The trial court, in its previously-quoted opinion, stated that the debts now under discussion "are viewed as gifts and it is impossible to now compensate Wife for these transfers." But to whom were the gifts made? It is clear that the trial court treated the expenditures represented by the debts as being gifts from Wife *to Husband*. We agree that they were gifts – Wife's use of her separate property for something not exclusively for Wife's direct benefit – but we view these expenditures, made during the marriage, as gifts of her separate property *for the benefit of the marriage*. As such, they are clearly characterized as marital obligations. The trial court erroneously labeled these debts as Wife's separate obligations. These obligations are marital debt subject to equitable distribution.

On the record before us, we conclude that the evidence preponderates against the trial court's finding that Wife's "transfers" of funds or numerous check and credit card expenditures during the marriage were "gifts" to Husband. We hold that the burdening of Wife with all of this debt is not equitable.

---

[4]We have reduced the stated balance from $7,000 to $2,000 to account for the balance Wife testified she owed at the time of the marriage, that balance clearly being her separate debt.

-11-

We agree with the trial court's conclusion that, the short duration of the marriage notwithstanding, it is impossible to restore these parties to the financial positions they had before the marriage. At the same time, we think it incumbent upon the courts to approach the equitable distribution of the parties' debts with the shortness of the marriage in mind. To that end, we conclude that a consideration of the *Alford* factors – (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt – leads to the conclusion that, in the present case, equitable means equal. *See Alford*, 120 S.W.3d at 813. Accordingly, the trial court's judgment is modified to assign responsibility for $54,350, or one-half of the total marital debt, to each party. Because Wife is solely liable, in a legal sense, to the various creditors, we conclude that Husband should be obligated to Wife for his portion of the marital debt as alimony in solido as support for Wife.

Alimony in solido, or lump sum alimony, is a form of long term support. *See* Tenn. Code Ann. § 36-5-121(h)(1)(2005). The "real need of the [disadvantaged] spouse seeking the support is the single most important factor . . . [and next] the courts most often consider the ability of the obligor spouse to provide support." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995). (citation omitted). In the present case, we believe that Wife demonstrated a need for an award of alimony. In addition, without the alimony in solido, Husband was awarded none of what we have determined is clearly marital debt. We believe that equity is not done by placing Husband in a better financial position than Wife following the division of the debt undisputedly incurred by both parties during the marriage.

Husband requests that this Court affirm the trial court's ruling as "fair and just" and "allow [the] parties to go on and rebuild their lives." Again, the evidence leads us in a different direction. Certainly, it is true that neither party was in an enviable financial position by the time the marriage ended. However, the proof shows that Wife was operating at a deficit each month in attempting to pay all of the parties' debts with her limited rental income, no foreseeable job, and no assistance from Husband. Husband, on the other hand, was at least able to generate some income from his existing appraisal business and was responsible to pay only $500 a month in rent in addition to basic living expenses. Although Husband operates on a tight budget, we believe that his *capacity* to earn is such that he has the ability to pay this award of alimony in solido representing support for Wife going forward.

In summary, we are mindful of the Supreme Court's observation that "the trial court has broad discretion and should do equity in allocating debt as one part of the overall distribution of marital property." *Alford,* 120 S.W.3d at 814. Here, where there was only debt to distribute, the evidence shows that all of the marital debt was improperly classified as Wife's separate debt, thus leaving her wholly responsible for all of it. In the final analysis,

the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See **Thompson v. Thompson***, 797 S.W.2d 599, 604 (Tenn. App. 1990). As discussed, we conclude that the equities preponderate in favor of an equal division of the marital debt between Husband and Wife. We therefore modify the judgment to award Wife against Husband the lump sum of $54,350 as alimony in solido in addition to our earlier award to her of $15,000, making a total in solido alimony award to Wife of $69,350.

D.

At this juncture, we conclude it is appropriate to address Husband's bankruptcy discharge in the context of the parties' divorce.[5] After the proof in this case was reopened, the trial court considered additional evidence, including an affidavit from Wife's expert bankruptcy attorney, Mr. Farinash, concerning the effect, if any, of Husband's discharge on the trial court's ability to distribute the parties' debt. Generally summarized, Mr. Farinash testified that under 11 U.S.C. § 523 of the Bankruptcy Code, debts to a former spouse including "domestic support obligations" and other divorce-related debts are nondischargeable. *See* 11 U.S.C. 523(a)(5), (a)(15). On his stated review of Husband's case file and the bankruptcy court's ruling, Mr. Farinash further stated, in relevant part:

> [Wife's] adversary proceeding in bankruptcy court was dismissed. . . . Judge Cook expressly excepted from his ruling any debts which the [trial court] may impose on [Husband].

In her "notice of filing" of Mr. Farinash's affidavit, Wife quotes verbatim from the referenced portion of page 12 of the bankruptcy court's ruling, with respect to disposition of Wife's adversary claim, as follows:

> Accordingly, for all the foregoing reasons, [Husband's] motion to dismiss [Wife's complaint seeking a determination of nondischargeability of debts] will be construed as a judgment on the pleadings and that motion will be granted. The order will make clear the dismissal is without prejudice as to any future cause of action predicated upon the provisions of 523(a)(5) and (a)(15).

Returning to his affidavit, Mr. Farinash further observed:

---

[5]None of the filings in Husband's bankruptcy case are in the record, although the record does indicate that Husband provided a transcript of the bankruptcy court's oral ruling in that case to the trial court. In addition, Husband has attached an incomplete copy of the transcript to his appellate brief.

As Judge Cook stated in his opinion, since [the trial court] had not yet ruled on whether [Husband] would be required to reimburse any marital debts or pay any support to [Wife], the issue of the dischargeability of these obligations was premature and . . . the issue could be raised again in Bankruptcy Court if [the trial court] ordered [Husband] to pay any obligations which could be determined to be nondischargeable pursuant to 11 U.S.C. 523(a)(5) or (15).

Mr. Farinash concluded his opinion as follows:

[The trial court] has the authority to declare that [Husband] has domestic support obligations as defined in section 523(a)(5) and (15) and to impose an obligation on him to hold [Wife] harmless from those debts will not violate the . . . discharge Order of [Husband] on debts in existence at the time of the filing of his bankruptcy action. As an alternative, [the trial court] could order [Husband] to pay [Wife] a sum certain of money and that would not violate the discharge Order.

Relevant provisions of the Bankruptcy Code and case law support Mr. Farinash's conclusion. In summary, 11 U.S.C. § 523 (a) sets forth exceptions to the dischargeability of debts in bankruptcy. As relevant to the present case, subsection (a)(5) excepts from discharge "domestic support obligations." Under the Code, a "domestic support obligation" is defined as follows:

[A] debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt . . . that is--
(A) owed to or recoverable by--
(i) a . . . former spouse. . .

* * *

(B) in the nature of alimony, maintenance, or support . . . of such . . . former spouse, . . . without regard to whether such debt is expressly so designated;
(C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of--

-14-

(i) a separation agreement, divorce decree, or property settlement agreement; . . . .

11 U.S.C. § 101. It should be noted that the trial court believed the attorney's testimony.

In addition, Section 523 (a)(15) excepts other divorce-related obligations, such as property settlements, "to a . . . former spouse . . . and not of the kind described in paragraph [(a)(5)] that is incurred by the debtor in the course of a divorce . . . or in connection with a . . . divorce decree or other order of a court of record. . . ." Addressing the nondischargeability of divorce-related obligations, the court in **Damschroeder v. Williams**, 398 B.R.464, 469-70 (Bankr. N.D. Ohio 2008), held that, as between former spouses, joint debts to third-party creditors that are "incurred" by the debtor former spouse in the parties' marital dissolution agreement are nondischargeable. The court stated:

> A requirement in a divorce decree to hold harmless or indemnify a spouse for joint obligations incurred during a marriage creates a "new" debt, running solely between the former spouses. It is this "new" debt which is "incurred" through the divorce decree, and which is nondischargeable; the parties' personal liability with respect to their joint third-party creditors remains, however, otherwise subject to the applicable legal process. As explained in the case of **In re Clark** [207 B.R. 651, 657 (Bankr. E.D.Mo. 1997)]:
>
>> the exception to discharge for "hold harmless" agreements may not provide protection from creditors for the non-debtor spouse. The debts owed to the joint creditors are discharged as to the debtor only. The obligation that is not dischargeable in these situations is a debtor's responsibility to hold his non-debtor, ex-spouse harmless. The non-debtor ex-spouse may look to the debtor for reimbursement pursuant to any nondischargeable "hold harmless" obligations, but the non-debtor ex-spouse is not immune from pursuit by the primary joint creditors.
>
> [I]t is the decision of this Court that [the listed joint obligations] . . . meet the necessary elements of § 523(a)(15) so as to qualify as nondischargeable debts. Consequently, the [non-debtor

former spouse] may continue to enforce her legal rights against the [debtor] with respect to these debts, notwithstanding the entry of discharge in this case.

Similarly, in **Deemer v. Deemer**, 360 B.R. 278, 281-82 (Bankr. N.D. Iowa 2007), the court concluded:

Plaintiff has concerns regarding whether she can raise the issue of Debtor's liability on the Sears and Best Buy debts in the parties' dissolution of marriage proceedings, in light of Debtor's discharge in his Chapter 7 case. Certainly the dissolution court can consider both parties' current assets and liabilities, as well as the fact that Debtor received a bankruptcy discharge, in determining support and the division of assets and debts between the parties. Although Debtor's discharge ends his liability to Sears and Best Buy, it has no effect on the dissolution court's post-discharge determination of the equities between the parties regarding marital debts.

We conclude from all of this that the Court has the ability to make the previously-stated award to Wife in the total amount of $69,350 as alimony in solido as support to her.

V.

A.

Wife asserts that the trial court erred when it denied her motion for an award of her attorney's fees, without comment, after initially finding that Wife was entitled to recover her reasonable attorney's fees from Husband. Wife additionally seeks an award of her reasonable attorney's fees in the prosecution of the instant appeal.

B.

As earlier quoted above, the trial court's May 5, 2011 Order expressly provided that "Husband shall pay Wife's reasonable attorney fees." Wife's brief accurately summarizes the procedural history of the case regarding the award of her attorney's fees that ensued:

On January 13, 2012, [the Court of Appeals] filed a Show Cause Order requiring [Wife's] counsel to show cause why the appeal should not be dismissed because no order had ever been entered

-16-

[at the] trial level on the issue of the amount of the award of attorneys fees to [Wife's] counsel. [Wife's] attorney moved this Honorable Court for additional time to supplement the record and filed a Motion for Attorneys fees in the trial [c]ourt, accompanied by an affidavit of [counsel's] time and expenses. No response was filed by [Husband] to the motion. On February 22, 2012[,] the trial [c]ourt denied the motion for attorney fees without comment.

(Internal citations to the appellate record omitted.)

An award of attorney's fees in divorce litigation is alimony in solido. ***Herrera v. Herrera***, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). In contemplating such an award, a court must carefully consider the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i). Awards of attorney's fees are within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 751 (Tenn. 2002).

Given the facts before us, we agree with Wife that the trial court erred in failing to award her attorney's fees. In particular, we agree that "the trial court erred in [its] summary denial of fees, which were submitted without objection or response[,]" after expressly determining that Wife was entitled to an award of such fees. Considering the same factors applicable to our decision to award Wife a lump sum of alimony in solido, we conclude that the trial court was correct to initially awarding Wife her reasonable attorney's fees in this case. There being nothing to support the trial court's reversal of its earlier award, we conclude the denial of fees was an abuse of the trial court's discretion. On remand, the trial court is directed to determine and award to Wife the amount of Wife's reasonable attorney's fees and expenses for professional services rendered at the trial court level, said award to be in the nature of alimony in solido.

C.

Finally, we consider Wife's request for an award of her attorney's fees and expenses on appeal. The decision whether to award attorney's fees incurred on appeal is a matter within the discretion of this Court. ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995); ***Seaton v. Seaton***, 516 S.W.2d 91, 93 (Tenn. 1974). Given the issues and results of the litigation as well as the respective financial positions of the parties in the present case, we conclude it is appropriate to exercise our discretion and grant Wife's request for an award of her reasonable attorney's fees and expenses for appellate work. On remand, the trial court will set these fees.

## VI.

The judgment of the trial court is modified, consistent with this opinion, to provide that Wife is awarded a judgment against Husband in the lump sum of $69,350 in the nature of alimony in solido support. Wife is also awarded her reasonable attorney's fees and expenses against Husband in connection with services rendered at the trial court level, said fees and expenses being further alimony in solido support to Wife. Wife is also awarded against Husband her reasonable attorney's fees on appeal, again as alimony in solido support. Fees will be set by the trial court on remand. This case is remanded to the trial court, pursuant to applicable law, for a hearing on said fees and for enforcement of the trial court's judgment, as modified, and for the collection of costs assessed below. Costs on appeal are taxed to the appellee, John Stewart Prestwood.

_____
CHARLES D. SUSANO, JR., JUDGE